513 So.2d 489 (1987)
Donald C. WYNN, Sr., Plaintiff-Appellee,
v.
Emmie Lee WYNN, nee Pepper, Defendant-Appellant.
No. 18954-CA.
Court of Appeal of Louisiana, Second Circuit.
September 23, 1987.
*490 Bruscato, Loomis & Street by Albert E. Loomis, III, Monroe, for defendant-appellant.
Lancaster, Baxter and Lancaster by Michael E. Lancaster, Tallulah, for plaintiff-appellee.
Before MARVIN, JASPER E. JONES and FRED W. JONES, Jr., JJ.
MARVIN, Judge.
The wife appeals a judgment of divorce that decreed the parties were mutually at fault and denied the wife's demands for permanent alimony. The issues are factual. We affirm.
The parties, both in their early fifties, married in 1979 and began living apart in April 1985. They were childless. Mrs. Wynn had a grown son by an earlier marriage. In April 1986, Mr. Wynn sought a divorce on grounds of their living apart for one year. Mrs. Wynn reconvened, seeking permanent alimony and a divorce on allegations of adultery.
The trial court found Mrs. Wynn's evidence insufficient to prove adultery, granted Mr. Wynn the divorce on their having lived apart for one year, and denied her permanent alimony, finding that the parties were "mutually at fault in causing marital discord leading to divorce." Mrs. Wynn contends the trial court erred in its finding that she did not prove her husband committed adultery and in its finding of mutual fault.

ADULTERY
The allegations of adultery concern Mr. Wynn's relationship with Dorothy Sanders, who began working as a waitress in a restaurant owned by Mr. and Mrs. Wynn in January 1985. In July 1985, about three months after Mrs. Wynn moved out of the family home, Ms. Sanders began renting a room in Mr. Wynn's three-bedroom house in Delhi. When Mr. Wynn's house was sold in June 1986, he began renting a room and storage space for his restaurant equipment from Ms. Sanders, who owned a three-bedroom house in Rayville. Ms. Sanders' mother also lived in the house during Mr. Wynn's tenancy. On September 1, 1986, Wynn moved to a room he rented elsewhere from another.
Cancelled checks or cash receipts were produced for the rental payments made by Ms. Sanders and Mr. Wynn to each other. Each gave reasons for their respective living arrangements and disavowed any romantic interest in the other.
Mrs. Wynn became annoyed when Ms. Sanders sometimes answered the phone when Mrs. Wynn frequently called her husband. Mrs. Wynn and two of her relatives spent a night in May 1986 watching Mr. *491 Wynn's house and testified that Mr. Wynn and Ms. Sanders were the only two people in the home. Mr. Wynn and Ms. Sanders admitted they lived in the same house and admitted other activities such as going out dancing a few times and spending the night at Mr. Wynn's daughter's house after the daughter married. They testified they had separate bedrooms that night as well as when they lived in each other's house. Several people who had been in Mr. Wynn's house while Ms. Sanders was living there testified that it appeared they maintained separate bedrooms. Mr. Wynn and Ms. Sanders described their relationship as friendship and denied any romantic or sexual involvement.
In oral reasons for judgment, the trial court stated:
I just don't think you proved adultery by the preponderance of the evidence. It may be, but I don't think it's been proven. You've got a lot of circumstances, and I don't believe I could find it from the circumstances, particularly in light of the testimony of the other witnesses that came into the courtroom and said that they did maintain separate bedrooms when they visited in the home. I think you've got to prove more than that to establish adultery.
Adultery may be established by circumstantial evidence which leads fairly and necessarily to the conclusion that adultery has been committed. The evidence is to be viewed in light of "experiences and observations of life." The fact that a man and a woman are alone together does not necessarily justify presuming that it is for romantic or sexual reasons. See Kendrick v. Kendrick, 232 La. 1104, 96 So.2d 12 (1957), and cases cited therein.
The trial court's findings concerning evidence of adultery, which is a factual issue, depend heavily on credibility evaluations which are entitled to "very substantial weight" on review. Pearce v. Pearce, 348 So.2d 75 (La.1977). Factual findings will not be disturbed on appeal unless they are clearly wrong, meaning that there is no reasonable basis in the record to support them. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Bizet v. General Acc. and Indem. Co., 457 So.2d 150 (La.App. 2d Cir.1984).
Mrs. Wynn proved only that her husband and Mrs. Sanders had the opportunity to commit adultery. To declare that they committed adultery, a court would have to resort to mere imagination that is not in harmony with present day social standards. Savin v. Savin, 218 La. 754, 51 So.2d 41, 45 (1951).
The trial court's refusal to "imagine" adultery was not error.

MUTUAL FAULT; PERMANENT ALIMONY
When, as here, a divorce is granted based on living apart for one year (LRS 9:301), the wife is entitled to permanent alimony only if she is free from fault and is without sufficient means for her support. CC Art. 160; LeBlanc v. LeBlanc, 362 So.2d 568 (La.1978). Even if the trial court had found sufficient proof of Mr. Wynn's adultery and had granted the divorce on that basis, Mrs. Wynn would still be required to show that she was free from fault in order to receive permanent alimony. Brannon v. Brannon, 362 So.2d 1164 (La.App. 2d Cir.1978).
A wife is not deprived of permanent alimony simply because she was not totally blameless in the marital discord. Nor is she deprived of it by conduct which constitutes a reasonably justifiable response to the husband's initial fault. To constitute fault, the wife's conduct must be of a serious nature and must be an independent contributory cause of the separation. Pearce, supra; Vail v. Vail, 390 So.2d 978 (La.App. 2d Cir.1980).
While a single episode or instance of cruelty ascends to legal fault only when it is severe, the court may consider the cumulative effect on the marriage of instances of less severe conduct. When one spouse's conduct, viewed as a whole, either alone or in combination with that of the other spouse, works to destroy the object of the marriage and to erode mutual harmony, that conduct may support the conclusion of *492 fault that renders the common life insupportable. Dooley v. Dooley, 478 So.2d 564 (La.App. 2d Cir.1985), writ denied, 480 So.2d 741 (La.1986).
Although the trial court did not specify what conduct served as the basis of its finding of mutual fault, its conclusion that Mrs. Wynn was at fault is a factual determination which will not be disturbed unless it is found to be clearly wrong. Pearce, supra.
Mr. Wynn did not appeal or answer the appeal on the issue of his fault. He is not claiming permanent alimony. His fault is relevant only to the extent that it would excuse or justify Mrs. Wynn's conduct. See Broussard v. Broussard, 462 So.2d 1386 (La.App. 3d Cir.1985); and Vail, supra.
The parties began living apart when Mrs. Wynn left the matrimonial domicile in April 1985. Since this was apparently done by mutual agreement, her leaving does not constitute abandonment. Mason v. Mason, 155 So.2d 216 (La.App. 2d Cir.1963); Broussard, supra. Evidence of Mr. Wynn's relationship with Ms. Sanders arose after the Wynns began living apart and is not relevant to the reason for the initial separation.
When Mrs. Wynn was asked what Mr. Wynn had done that played a part in her leaving, she responded that he had been staying out late, not letting her know where he was; he had threatened to leave and had told her he did not love her; and he had been sleeping on the sofa instead of with her. She felt he was seeing another woman. She also testified that he "was taking money or keeping money from the family account, putting it into other accounts." She denied giving him cause to do any of these things.
When Mr. Wynn was asked about the reason for the separation, he replied:
It became very apparent that I could not trust Emmie Lee Wynn since she took [$700] out of my wallet, wrote a cash check for [$3,000], tearing the check out from way over in the checkbook so I wouldn't notice it; cashing it at the drive-in window of the bank, and then going to another bank ... and closing a joint savings account that we had there. All on the same day. * * *
She placed it in some other accounts in hers and her son's name. It was a total of [$4,300] there in one day that went missing.
When asked why he had so much cash in his wallet, Mr. Wynn answered:
We made an agreement, when she went to work [as a waitress] she told me that she was going to keep all of her tips to use as she saw fit. I told her that was fine, that I would deduct the transportation charges off of my oilfield work since my truck belonged to me before our marriage, and I was wearing it out. She had sold her car that she had when we married and put the money in a, in hers and her son's name, in a CD. And then she told me that she was going to keep her tips, which usually averaged from eighty to a hundred dollars a week. So I was keeping the fifty dollars per job out of my Free State Tool check. When I would get a thousand dollars, I would buy a CD and apply it on the restaurant bank loan.
Mrs. Wynn testified that she kept some of her tips and put the rest into a joint bank account. She admitted taking the money from Mr. Wynn's wallet and from joint accounts and depositing it into accounts in her name or the name of her son by a previous marriage, but said she did this only after she found out "that he was taking money ... that he got out of his work that he never did even put in the [joint account]" and putting it into other accounts in Shreveport and Arkansas.
Mr. Wynn denied keeping community funds from Mrs. Wynn and explained that the account in Arkansas consisted of money he inherited before the marriage. He used it to pay work-related expenses and deposited the reimbursements he received from his employer back into the same account.
Since the inherited money Mr. Wynn advanced himself from his separate account to pay traveling expenses was his *493 separate property and was replaced as Mr. Wynn's employer reimbursed him, Mr. Wynn's conduct in this respect was reasonable and proper. Even if Mrs. Wynn put some of her tips into the joint account, the cash money Mr. Wynn kept as part of their agreement was being accumulated for eventual use to reduce the debt for the jointly-owned restaurant.
Mr. Wynn denied telling Mrs. Wynn that he wanted to separate before the incident he described about her taking of the money:
The problems with the money was the beginning of our problems. When, when she took the money and placed it where I could not use it for working capital in the restaurant, it almost caused my restaurant to go broke then. And I was able to borrow enough money to keep it afloat, but the interest has eaten me up ever since.
The restaurant closed about six months after the Wynns separated, leaving debts which depleted most of the community assets.
Mrs. Wynn's surreptitious removal of substantial cash sums from Mr. Wynn's wallet and their joint accounts was not a reasonably justifiable response to Mr. Wynn's handling of money and was detrimental to Mr. Wynn's trust of her and to the financial condition of their restaurant.
Mr. Wynn also complained of Mrs. Wynn's conduct after they began living apart. He said she made harassing phone calls to his home when Ms. Sanders was living there and that she upset him and jeopardized his health by visiting him against his wishes while he was in intensive care in the hospital.
Mrs. Wynn testified that some of the phone calls were made to find out if Ms. Sanders was living in the house and some were made to discuss tax returns and the division of personal property with Mr. Wynn. She described the hospital visit as a reconciliation effort.
The evidence of Mrs. Wynn's conduct, whether viewed alone or in combination with the evidence of Mr. Wynn's conduct, reveals substantial violations of her marital obligations which contributed to the destruction of the object of the marriage and the erosion of mutual harmony. See Pearce and Dooley, supra.
When the record is viewed most favorably in support of the judgment, we cannot say the trial court was clearly wrong in its conclusions. At appellant's cost, the judgment is AFFIRMED.