540 So.2d 1254 (1989)
Charlsey Pillars RICHARDSON, Plaintiff-Appellant,
v.
Robert J. RICHARDSON, Defendant-Appellee.
No. 87-1313.
Court of Appeal of Louisiana, Third Circuit.
March 15, 1989.
*1255 Cole, Guidry & Prather, Robert L. Cole, Lafayette, for plaintiff-appellant.
Domengeaux & Wright, Edgar G. Mouton, Jr, Lafayette, for defendant-appellee.
Before STOKER, DOUCET and KNOLL, JJ.
STOKER, Judge.
This appeal is from a judgment decreeing a partition of the community of acquets and gains which formerly existed between Charlsey Pillars Richardson and Robert J. Richardson. Mrs. Richardson seeks reversal or modification of certain aspects of the partition judgment. Mr. Richardson seeks maintenance of the trial court's judgment of partition, but seeks reversal of the award of permanent alimony to Mrs. Richardson. The parties were married on June 9, 1957 and obtained a separation from bed and board effective January 29, 1985. A judgment of divorce was subsequently rendered on July 23, 1987. The judgment partitioning the property which belonged to the former community was rendered May 5, 1987.
The trial court, acting pursuant to LSA-R.S. 9:2801, divided the community assets and liabilities, provided for certain credits to the parties and reimbursements due, and determined the nature of certain obligations as community or separate. These findings and determinations were incorporated into the May 5, 1987 judgment. Subsequent to this, a judgment of divorce was awarded in favor of Mrs. Richardson and she was awarded permanent alimony in the sum of $400 per month.
The issues presented for appeal are:
(1) whether the trial court erred by failing to hold defendant in contempt of court for his unauthorized removal of funds from a court-ordered escrow account;
(2) whether the trial court erred by refusing to allow plaintiff's claim for credits to the community for the unauthorized payments made to defendant by the community-owned corporation, Lafayette Bureau of Credit Control, Inc.;
(3) whether the trial court erred by classifying a judgment rendered against defendant in Pillars v. Richardson as a community debt;
(4) whether the trial court erred by finding that the entire community coin collection was valued at only $54,000 and awarding same to plaintiff at a value of $54,000; and,
(5) whether the trial court abused its much discretion in awarding $400 per month permanent alimony to the plaintiff.

CONTEMPT
Mr. and Mrs. Richardson, during their marriage, purchased a cattle ranch in Pleasant Hill, Louisiana. This purchase was financed through the owner-vendor, and the parties were obligated to make annual payments in September of each year. After the parties physically separated in January of 1985, Mrs. Richardson moved to the ranch. Mrs. Richardson's parents, Mr. and Mrs. Pillars, also lived on the ranch and managed it. In September of 1985 Mrs. Richardson and her parents decided to move from the ranch because all were in declining health and were unable to continue to maintain the ranch. Mr. and Mrs. Richardson, at that time, discussed the possibility of selling the property or deeding it back to the vendor. Mrs. Richardson left it in Mr. Richardson's hands and moved to Texas.
On September 13, 1985 Mrs. Richardson moved to have the temporary restraining order lifted which had been placed upon the parties with respect to encumbering, alienating or disposing of the community property. Mrs. Richardson wanted each party to have the option of selling the cattle in his or her possession and depositing any funds received into an escrow account. The trial court signed a judgment to that effect on February 6, 1986 ordering sale proceeds to *1256 be deposited into an escrow account in the name of both parties with withdrawal requiring the signature of both parties. The account was subsequently opened by Mr. Richardson and deposits of sale proceeds of approximately $17,000 were made into it.
In order to make the $9,200 annual payment in September of 1985 on the ranch, Mr. Richardson, with Mrs. Richardson's assent, borrowed $9,000 from First National Bank of Gilmer, Texas. The annual installment was paid and Mr. Richardson continued to manage the ranch and, in fact, moved there for a period of time.
By the following year (1986), when the note at the Gilmer bank came due, the Richardsons were unable to pay the note and the bank would not extend the terms. No sale had been arranged for the property and no dation had been agreed to by the vendor. Defendant asked that Mrs. Richardson agree to use the funds in escrow to pay the note. She refused to do so. Acting upon advice of counsel, Mr. Richardson unilaterally transferred the funds in escrow at First National Bank of Lafayette to an interest-bearing account at the First National Bank of Gilmer in order to avoid having a suit filed by the bank. The transfer did not pay the debt, it simply provided collateral security pending the settlement of the community.
On January 26, 1987 Mrs. Richardson filed a rule to hold defendant in contempt for having removed the $17,322 from the escrow account. The trial court refused to hold defendant in contempt, finding that:
"The purpose of a contempt proceeding is to uphold the authority of the Court, and not to benefit a party litigant. Ferry v. Ferry, 444 So.2d 797. Such a proceeding, of course, may, and frequently does, benefit the Mover. However, such proceedings should not be resorted to where other specific remedies are available. Ferry, supra.
"In the instant case, the Court finds that while the Defendant did violate an Order of this Court not to remove funds from the First National Bank of Lafayette, such conduct was not willful disobedience as required by C.C.P. 224(2) but rather was done on advice of counsel with the intent to help and protect the Community interests. No funds were lost or misplaced by his action."
Willful disobedience is defined as "an act or failure to act that is done intentionally, knowingly, and purposely, without justifiable excuse." Ferry, supra, at 799.
While defendant did violate court orders in unilaterally transferring community funds, defendant was charged with the management responsibilities of the community and the loan was made to preserve community property. Plaintiff agreed to the making of the loan to pay the note on the ranch and refused to use the escrowed funds to pay the indebtedness. We cannot say that the trial court committed manifest error in refusing to hold defendant in contempt.

LAFAYETTE BUREAU OF CREDIT CONTROL, INC.
In 1962 Mr. and Mrs. Richardson incorporated the Lafayette Bureau of Credit Control, Inc. (LBCC). Mr. and Mrs. Richardson owned eleven (11) of twelve (12) shares of stock issued. Mr. Richardson's mother owned the remaining one (1) share. The corporation's business was collecting debts for other businesses for a certain percentage of whatever funds were collected. Mrs. Margaret Richardson, defendant's mother, died in 1967 and her share of stock was never transferred to her heirs nor was she replaced on the board of directors. Both plaintiff and defendant were members of the board and both worked in the business.
On April 9, 1985 defendant sent notice to plaintiff of a board of directors' meeting to be held on April 11, 1985. Plaintiff was out of town and did not receive the notice until after the meeting took place. At this meeting, new officers were elected, and a dividend of $25,000 was declared in favor of plaintiff and defendant. However, the dividend was put back into the corporation at defendant's direction in payment of an earlier loan made by the corporation to *1257 plaintiff and defendant. Plaintiff was also given the 1981 Buick which she drove. The new board increased defendant's salary from $1,000 to $2,000 per month, retroactive to December 1, 1984, and made a loan to defendant of $1,568. Additionally, the minutes reflect that on March 25, 1985 the corporation entered into a "lease" contract with an employee, Dallas Simon, to "lease" the corporation's business for $1 per month for a term of two years. One of the provisions of the contract was that defendant would be kept on at his salary, given a $1,000 per month consultant's fee and he could not be fired. Defendant was also paid a $5,000 finder's fee for negotiating the contract.
In the partition proceeding, plaintiff sought a credit for these funds from the community. The basis of the claim was that defendant acted without proper corporate authority in paying these amounts to himself. Plaintiff alleged that these payments in salary were in actuality disguised rental payments due to the corporation by virtue of the lease of the Credit Bureau. The trial court denied plaintiff a credit for these sums finding that the claim belonged to the corporation and not to the community.
The plaintiff's claim, in essence, amounts to a demand for an accounting for revenues allegedly due to her from the corporation by virtue of her co-ownership of the corporation's stock. The revenues allegedly diverted by defendant to himself would have belonged to the corporation and would have been earnings of the corporation as a result of the lease. For that reason, the amounts paid defendant, if in actuality they were disguised rental payments, did not belong to the community. If they had constituted fruits or revenues from property of the former community and the property was under defendant's control at the termination of the community, then defendant would have owed plaintiff an accounting for those fruits or revenues. However, what was owned by the former community in this case was corporate stock. The fruits or revenues attributable to this stock, not the direct earnings of the corporation itself, would belong in part to the plaintiff. To the extent that the earnings of the corporation might have increased the value of the corporate stock, plaintiff would have an action. Plaintiff did not prove that these earnings resulted in an increase in the value of the corporate stock or that any sums were payable to her by the corporation. Plaintiff did not attempt to prove that any diminished value of the corporate stock resulted from any negligent management by defendant during his possession and control of the corporate business.
We find that the trial court was correct in denying this credit claimed by plaintiff.

DEBT DUE IN PILLARS V. RICHARDSON
In 1982, during the existence of the community of acquets and gains, Mrs. Richardson's parents, the Pillars, transferred approxiamtely $19,000 by check to Mr. Richardson. This $19,000 was Mr. and Mrs. Pillars' life savings. The check was made payable to Mr. Richardson and was endorsed to E.F. HUTTON. The funds were deposited into an E.F. Hutton account in Mr. and Mrs. Pillars' names with Mr. Richardson having a power of attorney to manage or withdraw the funds. Mr. Richardson subsequently withdrew the funds and in February 1983 loaned the money to John Dunagan. Mr. Dunagan was a business associate and had sold LBCC its computers. Mr. Dunagan had a contract to service the computers, as part of the sale, and as a result of his poor business acumen was in financial straits. Mr. Richardson testified that he loaned the money to Dunagan because he was having financial difficulties and to enable him to continue servicing the corporation's computers. The Pillars ultimately sued Mr. Richardson for their money, and judgment was rendered by stipulation of the parties subsequent to the partition suit.
The trial court found that this obligation to repay the Pillars was a community obligation and plaintiff has appealed this aspect of the partition judgment.
*1258 A community obligation is one incurred by a spouse during the existence of a community property regime for the common interest of the spouses or for the interest of the other spouse. LSA-C.C. art. 2360. The evidence before us for review does not support a finding that the transfer was a loan by the Pillars to the Richardsons. The documentary evidence and testimony of Mrs. Pillars establishes that they entrusted their savings to their son-in-law for investment. The check was never deposited into the Richardsons' account and the E.F. Hutton account was in the Pillars' names. The evidence supports the finding that there was never a change of ownership of the funds intended by the parties. Mrs. Richardson was not consulted about or made aware of Mr. Richardson's actions concerning her parents' money. Mr. Richardson appropriated the money for his own purposes, or at least for the corporation's purposes, and not for a community purpose. Mr. Richardson argues that the loan benefitted the community because it enabled Mr. Dunagan to continue to service the corporaton's computers, in spite of the fact that this was part of the computer sale contract. Mrs. Richardson testified that defendant had approached her at an earlier time with the idea of loaning money to Mr. Dunagan, but she rejected it because of Mr. Dunagan's history of financial trouble.
The fact that the money was not loaned by the Pillars to either one of the Richardsons, that Mr. Richardson withdrew the funds without the Pillars' knowledge and the fact that the Pillars did not consent to a loan of their money to Mr. Dunagan amounts to a conversion of Pillars' money by defendant. This situation is governed by LSA-C.C. art. 2363 which defines separate obligations.[1] We find that the trial court was in error in determining that the obligation to the Pillars is a community one simply because it arose during the existence of the community. Therefore, the judgment is reversed insofar as it condemns Mrs. Richardson to pay part of the judgment against Mr. Richardson in the case of Pillars v. Richardson.

COIN COLLECTION
During the Richardsons' marriage, they operated a business known as "Coin and Treasure." In this business they collected, bought and sold coins of all types. They sold the business in 1982 to Louis Pizzolato. After the sale, they moved the coins out of the shop and transported them back and forth between Pleasant Hill and Lafayette for storage purposes.
In March of 1985, after the parties physically separated, it was stipulated that Mr. Richardson's father would inventory the coin collection. By September this had not been accomplished and plaintiff demanded possession of the coins which were in defendant's possession. Defendant subsequently transported the collection to Houston where it was inventoried and appraised by the Houston Numismatic Exchange. In March 1986 the court ordered the defendant to turn the coin collection over to the plaintiff to be divided in lots of equal value. Plaintiff alleges that the coin collection which defendant turned over to her was a fraction of the collection that they originally moved out of Coin and Treasure.
It is plaintiff's contention that the original collection was worth at least $500,000 and that what remained had been valued by the Houston Numismatic Exchange at one-tenth of that amount. Plaintiff alleges that what defendant had in his possession at the time the parties separated was substantially more than what he transferred to her one year later.
Plaintiff attempted to show, not that the value of what remained was greater, but *1259 that defendant had disposed of substantial quantities of coins from the collection. However, plaintiff had no inventory of the original collection to rely on, she had only her recollection of what was or should have been there. In addition, plaintiff and her son testified that the original collection was larger than the one delivered to plaintiff and that defendant had told them that the collection was worth at least $500,000 on one occasion in 1982.
Plaintiff has appealed the trial court's valuation of the coin collection at $54,000. Additionally, plaintiff complains that the trial court refused to find that valuable parts of the coin collection were disposed of by defendant while the collection was in his possession and that she is due an accounting for that property.
The defendant denied disposing of or hiding parts of the coin collection. His explanation for any difference in the appearance of the collection was due to a consolidation of the coins into fewer boxes. Defendant admitted that the collection may have been worth $500,000 in 1982, but explained that the values of the coins had declined since then due to prices of silver and gold. Defendant denied that there was ever a large quantity of gold coins. Defendant did admit there was little difference in the price of gold and silver in 1982 and 1987, therefore the coins would have had substantially the same value in 1987 as in 1982.
Louis Pizzolato testified that when he purchased Coin and Treasurer it was his recollection that 70% to 80% of the total value of the collection was in 10% to 15% of the coins. When he saw them in 1982, he valued the best pieces in the $75,000 price range and at $5,000 for the remainder of the collection. Mr. Pizzolato stated that he never saw a large quantity of gold coins and never saw the whole collection again after his purchase of the business.
While defendant's explanation of the decline in the value of the collection is doubtful, it is reasonable to believe that if any of the collection was in fact disposed of, it could have occurred in the three-year period from 1982 to 1985. The parties were still living together during the time the collection was transported on at least two occasions, and parts were stored in the attic of the home, at Coin and Treasure and hidden in other places in the home. Plaintiff failed to show that any diminution in value occurred between January 1985 and March 1986 and was exclusively the result of defendant's control or possession of the property.
As concerns the valuation of the coin collection turned over to the plaintiff, the only evidence of its value was that assigned by the Houston Numismatic Exchange in March of 1986 at defendant's request. That value was $48,031.89. Plaintiff assigned this value to the collection in her detailed description list. Defendant assigned a value of $54,000. When questioned concerning the value, defendant testified it took into account items yet to be discovered. These items had not been accounted for at the time of trial; therefore, we find that the trial court erred in accepting defendant's value. What defendant transferred to plaintiff was valued at $48,031.89, and no other proof of value was offered. Defendant argues that if plaintiff sells the coins to other collectors she can recover much more than $54,000; therefore, $54,000 is more than a fair value. This argument lacks merit. There being no other proof of value besides the appraisal obtained by defendant, we find that the trial court abused its discretion in valuing the collection at $54,000. We amend the judgment insofar as it awards plaintiff the value of the coin collection at $54,000 and reduce it to $48,031.89. The reduction creates an unequal distribution of the assets of the community. To effect an equalization, the plaintiff is awarded a money judgment for one-half of the amount by which the coin collection was overvalued. Plaintiff then receives one-half of the amount that defendant's assets exceeded the assets awarded to the plaintiff. This amounts to $2,984.05 and this is awarded to the plaintiff.

PERMANENT ALIMONY
The defendant has appealed the trial court's judgment awarding permanent alimony *1260 to the plaintiff in the amount of $400. The defendant argues that the plaintiff should have been required to deplete some of her assets before being entitled to alimony. He also argues that he is unable to pay alimony because his expenses exceed his income.
Plaintiff prayed for alimony in the amount of $2,000 per month in the petition for divorce. In her Affidavit of Income and Expenses she stated that she had no income with monthly expenses of $2,234.75. The trial court did not assign reasons for his ruling, but awarded plaintiff $400 per month rather than the $2,000 prayed for. Defendant argues that the trial court abused its discretion in awarding alimony to the plaintiff because (1) plaintiff has sufficient means for support by virtue of the community property partition and (2) defendant, himself, has insufficient means to pay alimony.
"Factors to consider in determining the amount of alimony to be awarded include the income, means and assets of the spouses, the liquidity of the assets, the financial obligations of the spouses, including their earning capacity, the health and age of the parties and any other circumstances that the court deems relevant." Vesper v. Vesper, 469 So.2d 458 (La.App. 3d Cir.1985).
A spouse is required to deplete her liquid assets to some extent before she may be entitled to post-divorce alimony. However, a spouse is not required to sell her non-liquid assets in order to support herself. Vesper, supra. Defendant maintains that plaintiff should be required to sell the coin collection, cattle, computer equipment and house in order to support herself. Additionally, he argues, plaintiff should be required to deplete the cash awarded to her.
All of the assets listed by defendant are non-liquid assets, except for $24,449.66 awarded to plaintiff. Plaintiff testified that she could sell the coin collection as a whole, but would get a greater value if the coins were sold individually because their value was numismatic rather than as gold or silver. The house, she testified, was in need of major repairs which she could not afford, therefore its marketability was diminished at the time. Moreover, at the time of the trial on the merits of the divorce, plaintiff had not received the $24,449.66 awarded to her, among other things, and the court had to order defendant to turn these things over to plaintiff. We find that plaintiff had no liquid assets to deplete at the time she was awarded alimony.
We must presume that the trial court found that defendant had the ability to pay and we so find. The major item in defendant's list of expenses is a $1,000 per month note to his father to repay money loaned to defendant to pay part of the judgment in Pillars v. Richardson. This note consumes one-half of defendant's net income as listed. Defendant may not incur such post-separation debts to avoid payment of alimony. Vesper, supra. Additionally, defendant was awarded substantial property in the partition judgment, including the only income-producing property owned by the community.
We find no abuse of discretion on the part of the trial court in awarding plaintiff $400 per month alimony.
Accordingly, the judgment of the trial court is reversed insofar as it characterizes the debt due Mr. and Mrs. Pillars as community; amended insofar as it placed a value of $54,000 on the community coin collection and that value is hereby set at $48,031.89, and judgment is hereby awarded in favor of plaintiff and against defendant in the sum of $2,984.05 (one-half of $5,968.11). In all other respects the judgment of the trial court is affirmed. Costs of this appeal are assessed equally to the parties.
REVERSED IN PART, AMENDED IN PART, AFFIRMED AS AMENDED.
NOTES
[1] Art. 2363. Separate obligation

A separate obligation of a spouse is one incurred by that spouse prior to the establishment or after termination of a community property regime, or one incurred during the existence of a community property regime though not for the common interest of the spouses or for the interest of the other spouse. An obligation resulting from an intentional wrong not perpetrated for the benefit of the community, or an obligation incurred for the separate property of a spouse to the extent that it does not benefit the community, the family, or the other spouse, is likewise a separate obligation.