567 So.2d 139 (1990)
Kevin R. GREEN, Plaintiff-Appellee,
v.
Barbara Pixley GREEN, Defendant-Appellant.
No. 21629-CA.
Court of Appeal of Louisiana, Second Circuit.
August 22, 1990.
*141 Goff, Caskey, Davis & Fallin by H. Russell Davis, Arcadia, for defendant-appellant.
Kevin R. Green, Homer, in pro per.
Before NORRIS, LINDSAY and HIGHTOWER, JJ.
*142 LINDSAY, Judge.
Barbara Pixley Green appeals from a trial court judgment which denied her claim for permanent alimony, but granted a divorce in her favor from her husband, Kevin R. Green, on grounds of adultery. In denying Mrs. Green's claim for permanent alimony, the trial court found that the parties were mutually at fault in the initial separation. Mrs. Green appeals from the judgment, and seeks monthly alimony payments of $1,400.

FACTS
The parties were married on November 15, 1984. They physically separated on August 31, 1988. On September 30, 1988, Mr. Green filed a petition for separation. In response to an exception of no cause of action filed by Mrs. Green, Mr. Green filed an amended petition on November 17, 1988, alleging mental cruelty and abandonment as grounds for separation.
On December 9, 1988, Mrs. Green filed an answer and reconventional demand, in which she alleged physical and mental cruelty by Mr. Green. On December 15, 1988, Mr. Green filed an answer to the reconventional demand. On February 13, 1989, Mrs. Green filed an amended and supplemental reconventional demand in which she alleged adultery by Mr. Green on three separate occasions in January of 1989. She sought an immediate divorce on these grounds. In an answer filed March 23, 1989, Mr. Green admitted the episodes of adultery.
Trial on the merits was held on March 29, 1989, and May 9, 1989. Mr. Green testified that his wife groundlessly accused him of adultery prior to their separation and that she was guilty of several episodes of mental cruelty. He stated that she engaged in verbal disputes with him at their family corporation, K.R. Green Designer/Builders, Inc., that she constantly "cut him down" in the presence of their employees, and that she asked one employee (Jerry Greenno relation) about the alleged infidelity. He also testified that she had deliberately made efforts to sabotage their business by refusing to cooperate in getting bonding for their commercial contracting business and by refusing to write paychecks and pay bills. He further stated that she contradicted his orders to their employees. Mr. Green accused his wife of making anonymous nuisance calls to him. He recounted an episode in which she parked her car behind his at a Sonic Drive-In and loudly accused him of being an adulterer. Mr. Green further testified that his wife refused to go on trips with him but would subsequently accuse him of having committed adultery when he went on the trips without her. He denied trying to force Mrs. Green to leave the matrimonial domicile during the summer of 1988. He also denied that he had ever struck Mrs. Green.
During the trial, testimony was produced by private investigators demonstrating several incidents of adultery in January of 1989 involving Mr. Green and Kathy Ellis Compton. Mr. Green conceded that Kathy and her three-year-old child were living with him. However, Mr. Green insisted that, prior to his physical separation from Mrs. Green, he and Kathy were platonic friends. He testified that a romantic relationship did not develop between them until late November of 1988.
Mrs. Green testified that there were no serious problems in the marriage until June of 1988. However, at the end of that month, she first became aware of suspicious activities on the part of her husband. She testified that on many occasions her husband stayed out till the early hours of the morning and became angry when she questioned him about his activities upon his return. On occasion he would shower and then leave on his bicycle, returning late at night without the appearance of having "worked out" and refusing to properly explain his long absences. She testified that she became suspicious that he was involved with Kathy, a family friend, in early July, 1988. She testified that Mr. Green went on several trips to Arkansas in the month of July. Upon his return late one Sunday after one of these trips, she drove to Kathy's house and observed Kathy unloading a car. Mrs. Green took this as confirmation *143 that the two had been on the trip to Arkansas together. Additionally, upon his return from one of his trips, Mr. Green told her that he wanted her to move out of the matrimonial domicile. She testified that she refused to leave and asked him to undergo marriage counseling. He refused.
Mrs. Green testified that she suffers from agoraphobia and panic attacks. As a consequence, she is unable to travel. She testified that this condition and her inability to travel were known to her husband when they married. She also stated that her medical problems make it impossible for her to work outside the home. (Her medical diagnosis was corroborated by David C. Strain, a psychiatric social worker who had been treating Mrs. Green since August, 1988.) She denied having made nuisance calls to Mr. Green or Kathy's family. On the contrary, she testified that she had received anonymous nuisance calls herself. She denied making a scene at the Sonic Drive-In, but testified that she had confronted her husband there and might have raised her voice. She further testified as to several episodes when her husband pushed her to the ground or against a wall.
Mrs. Green also presented the testimony of Wayne Tanner and Jimmy McDonald, who testified that in August, 1988, they had seen Mr. Green and an unidentified woman driving together in a pickup truck in Arcadia. Mr. McDonald testified that his wife, a close friend of Mrs. Green, had recounted the episode to Mrs. Green, who then confronted Mr. Green.
On rebuttal, Mr. Green denied having been in the pickup truck with another woman. He also denied going to Arkansas on several of the weekends asserted by Mrs. Green.
On May 15, 1989, the trial court issued reasons for judgment. It granted the divorce on grounds of adultery. However, the trial court denied permanent alimony to Mrs. Green, finding that each party was partially at fault in the original separation. A judgment in conformity with this opinion was signed on June 13, 1989.
On June 20, 1989, Mrs. Green filed a motion for new trial on the issue of alimony. She alleged that newly discovered evidence demonstrated that Mr. Green had lied when he testified that he had not been in Arkansas on July 30, 1988. An affidavit by Mrs. Green asserted that she had discovered a telephone bill which verified her testimony that her husband had called her from Arkansas on the date in question. The phone bill purported to show a credit card call to their home from Mt. Ida, Arkansas. She asserted that only she and her husband had access to the calling cards and that no unauthorized calls were made before or after the July 30th call. On July 11, 1989, the trial court denied Mrs. Green's motion for new trial.
This appeal follows. Mrs. Green asserts that the trial court erred in finding that she was guilty of legal fault sufficient to preclude her from receiving permanent alimony.

ENTITLEMENT TO PERMANENT ALIMONY
Mrs. Green asserts that the trial court erred in finding that she was guilty of legal fault which would render her ineligible to receive permanent alimony under LSA-C.C. Art. 160. The trial court gave no specific written or oral reasons in support of its finding that the parties were mutually at fault in the separation. Its sole statement on this issue was as follows:
"The Court finds Plaintiff and Defendant were each partially at fault in causing their original separation. Plaintiff's fault and Defendant's fault were each of such a nature as to render their living together insupportable."
Mr. Green did not answer the appeal. Consequently, the trial court's finding that he was at fault is final, and we are precluded from considering it. Harrington v. Campbell, 413 So.2d 297 (La.App. 3rd Cir. 1982).
Under LSA-C.C. Art. 160, a spouse seeking permanent alimony must be *144 without "fault."[1] In this context, "fault" contemplates conduct or substantial acts of commission or omission of the spouse, violative of his or her marital duties and responsibilities. A spouse is not deprived of permanent alimony simply because he or she was not totally blameless in the marital discord. Nor is he or she deprived of it by conduct which constitutes a reasonably justifiable response to the other spouse's initial fault. To constitute fault, a spouse's misconduct must not only be of a serious nature but must also be an independent contributory or proximate cause of the separation. Adams v. Adams, 389 So.2d 381 (La.1980); Wynn v. Wynn, 513 So.2d 489 (La.App. 2d Cir.1987).
Only conduct which would entitle one spouse to a separation or divorce under LSA-C.C. Art. 138(1)-(8) or L.C.C. Art. 139 is sufficient to deprive the other spouse of alimony after divorce. Adams, supra. Under Art. 138(3), cruel treatment by one spouse towards the other which renders their living together insupportable provides grounds for separation.
Under Louisiana law and jurisprudence, a continued pattern of mental harassment, nagging and griping by one spouse directed to the other can constitute cruel treatment sufficient to support a judgment of separation. However, proof only of mutual incompatibility, fussing and bickering between the spouses cannot. Batiste v. Batiste, 548 So.2d 14 (La.App. 5th Cir.1989).
The burden of proof is on the party seeking alimony to show that he or she is without fault in causing the dissolution of the marriage and that he or she is in necessitous circumstances and in need of support. A trial court's finding of fact on the issue of fault will not be disturbed on appeal unless it is clearly wrong. Thibodeaux v. Thibodeaux, 525 So.2d 69 (La. App. 3rd Cir.1988).
Mere uncorroborated testimony of one spouse as to the other spouse's alleged acts, contradicted by the accused spouse, where the credibility of neither is attacked, will not constitute a preponderance of the evidence required to justify a judgment of separation absent an ability of the trial court to determine the truth of what occurred by weighing credibility. Jenkins v. Jenkins, 441 So.2d 507 (La.App. 2d Cir. 1983), writ denied 444 So.2d 1223 (La.1984).
The question at issue in this case is whether Mrs. Green's conduct constituted the kind of cruel treatment which would have supported a judgment of separation on that basis under Art. 138(3). In resolving this issue, we find it helpful to examine other cases dealing with adjudication of fault against a spouse under similar circumstances. In Langton v. Langton, 442 So.2d 1308 (La.App. 3rd Cir.1983), the husband testified that when he went home at night his wife would question him about his whereabouts, call him a slouch and accuse him of infidelity. Additionally, she would not have supper prepared for him. The court held that such actions by the wife did not constitute cruel treatment, especially when the husband was also guilty of irritating the wife.
In Thibodeaux v. Thibodeaux, supra, the wife frequently accused the husband of infidelity, especially when he returned late from work. On one occasion she observed the husband and his former girlfriend leaving the woman's residence at 10 o'clock at night. The court found that the wife's "accusation of extra-marital activity were not totally unfounded and therefore would not constitute cruel treatment." Nor did the wife publicly defame the husband by making inquiries as to his activities of a fellow employee when the record revealed no malice on her part.
In Vincent v. Vincent, 544 So.2d 544 (La.App. 5th Cir.1989), the husband was frequently absent from home and the wife suspected him of infidelity. One evening *145 the wife drove around looking for him, and eventually followed him and another woman to a lounge. The wife confronted them and made such a scene she was evicted from the establishment. The court reversed the trial court's finding of mutual fault insofar as it concerned the wife, holding that the wife's reaction, while outrageous, "was not altogether unprovoked."
However, in Dooley v. Dooley, 478 So.2d 564 (La.App. 2d Cir.1985), writ denied 480 So.2d 741 (La.1986), the wife continuously accused the husband of having an affair with his secretary for several months before the separation. She told numerous persons, including their children, of her suspicions. She threatened to "blow away" the husband and his secretary. According to witnesses, she spread rumors about the couple planning to run off together in an apparent effort to cause the husband to lose an election for sheriff. She continuously made negative remarks about all aspects of their married life together. She further embarrassed her husband by constantly cursing in public, dressing inappropriately, and failing to appear at campaign functions and conventions. The court upheld a finding of mutual fault.
In Tampira v. Tampira, 531 So.2d 1088 (La.App. 4th Cir.1988), writ denied 533 So.2d 362 (La.1988), the wife constantly accused the husband of infidelity without any supporting evidence. She accused him of having affairs with their maid and one of his office employees; she fired the office employee on this basis. She frequently called his office and quizzed his employees about his alleged infidelity. The wife also resorted to violence, physically attacking the husband. She threw heavy objects at him and once bit him so badly that a scar remained on his chest. She cut up several of his shirts and ties. The wife also endeavored to inconvenience her husband by playing a radio at night loudly enough to keep him awake and by hiding his car keys so he could not go to work. She also groundlessly called the police asserting that her husband was physically abusing her. The court found the wife at fault in this case.
We find that Mrs. Green's actions do not constitute cruel treatment. Her actions (caused by her not unfounded suspicions) do not approach the severity of the actions of the wives in Dooley or Tampira.
Although we do not have the benefit of the trial court's assessment of the facts and its reasons for rendering judgment, we can only conclude from this record that the trial court found that Mr. Green was, in fact, seeing another woman. Although the parties testified contradictorily to each other on numerous issues, Mrs. Green had support from two independent witnesses, Wayne Tanner and Jimmy McDonald. (Of all the witnesses that testified at trial, only Mr. Tanner lacked a close connection to either of the parties; Mr. McDonald's wife was a friend of Mrs. Green.) They testified that in early August of 1988, they saw Mr. Green and a dark-haired woman other than Mrs. Green riding together in a pickup truck. (Photographs admitted into evidence demonstrate that Kathy is a brunette.) While this testimony certainly falls far short of proving adultery, this evidence gives credence to Mrs. Green's suspicions about her husband's infidelity. Mrs. Green was already suspicious of Mr. Green's nocturnal bike rides, before which he showered. Upon his return home many hours later, he did not have the demeanor of one who had been riding a bicycle for several hours. He also took several suspicious trips to Arkansas in July of 1988. It was this behavior by Mr. Green which resulted in the argument at the Sonic Drive-In, during the course of which Mrs. Green called her husband an adulterer. Mrs. Green told an employee, Jerry Green, of her suspicions.
Under the circumstances presented in this case, we find that Mrs. Green's actions were a reasonable and justifiable response to Mr. Green's primary fault. It is understandable that Mrs. Green quarreled with her husband over his suspicious absences from the matrimonial domicile. Although Mr. Green testified that he and his wife had experienced problems for two years prior to their separation, these problems appear to have been of a minor nature and frequently involved business disputes. It *146 was only after the separation that Mrs. Green refused to cooperate in obtaining bonds for company projects. She reasonably explained this action by stating that she feared exposing her separate property and that of her mother. (Previous bonds had been secured in reliance upon Mrs. Green's separate property, which included an inheritance from her father over which her mother had a usufruct.)
Mr. Green's claim that Mrs. Green was guilty of abandonment was not addressed by the trial court. However, the record supports a finding that Mrs. Green left the matrimonial domicile with lawful cause.[2] Her departure was clearly in response to Mr. Green's conduct. Further, Mr. Green's claim that he sought his wife's return is questionable at best. One of the elements necessary to prove abandonment is that the abandoned spouse desired the other spouse's return. Mr. Green testified that he continued to seek her return "[a]s late as November, maybe even December." Yet, even by his own admission, he and Kathy began dating in November, became "intimate" in mid-December and began living together shortly after Christmas. The evidence also established that as early as October, Kathy accompanied Mr. Green to Texas to pick up his daughter from a previous marriage. In October, she also began to work for his new company, Pro-Build, Inc., doing the same basic job which was previously performed by Mrs. Green.
Based on the foregoing, we find that the trial court was manifestly erroneous in adjudicating mutual fault in the separation. Inasmuch as Mrs. Green's behavior was a reasonably justifiable response to Mr. Green's conduct, Mrs. Green cannot be deemed guilty of fault in the initial separation.
This assignment of error has merit, and the trial court judgment is reversed as to the determination of fault on the part of Mrs. Green.

AMOUNT OF ALIMONY
Having found that Mrs. Green is entitled to receive alimony, we now set the amount. Inasmuch as the record before us is complete on this issue, we find it unnecessary to remand the case to the trial court.
Permanent alimony is awarded to a former spouse in need and it is limited to an amount sufficient for the former spouse's maintenance. Maintenance includes food, shelter, clothing, transportation, medical and drug expenses, utilities, household maintenance, and income tax liability generated by alimony payments. Meyers v. Meyers, 344 So.2d 451 (La.App. 2d Cir.1977); Gray v. Gray, 451 So.2d 579 (La.App. 2d Cir.1984), writ denied 457 So.2d 13 (La.1984).
Factors to consider in determining the amount of alimony to be awarded include the income, means and assets of the spouses, the liquidity of the assets, the financial obligations of the spouses, including their earning capacity, the health and age of the parties and any other circumstances deemed relevant by the court. Vesper v. Vesper, 469 So.2d 458 (La.App. 3rd Cir.1985).
The spouse seeking alimony has the burden of proving necessitous circumstances or insufficient means for his or her maintenance. "Means" includes income and capital. Vorisek v. Vorisek, 423 So.2d 758 (La.App. 4th Cir.1982); Musselman v. Musselman, 524 So.2d 90 (La.App. 4th Cir. 1988).
Liquid assets must be depleted to some extent before a spouse may be entitled to post-divorce alimony. However, a spouse is not required to sell non-liquid assets in order to support himself or herself. Vesper, supra; Richardson v. Richardson, *147 540 So.2d 1254 (La.App. 3rd Cir. 1989). However, the jurisprudence clearly establishes that one is not required to sell his or her house and deplete the proceeds before being entitled to receive alimony. Moncus v. Moncus, 510 So.2d 1271 (La. App. 3rd Cir.1987), writ denied 514 So.2d 462 (La.1987).
Special medical expenses such as psychiatric treatment generally do not fall within the category of "basic necessities" which may be proved by the unsupported testimony of the spouse seeking alimony. Sufficient proof of the medical condition, the need of treatment, and the cost thereof must be presented. Thiel v. Thiel, 388 So.2d 1170 (La.App. 4th Cir.1980).
The record demonstrates that Mrs. Green is in necessitous circumstances. She suffers from an anxiety disorder with panic attacks and agoraphobia for which she has been treated by Dr. Patrick Sewell and Mr. Strain. Mr. Strain expressed the opinion that Mrs. Green is currently unable to hold a conventional "public" job. However, he could not precisely determine the extent to which she might be reacting to the stress of the divorce or exaggerating her condition to obtain alimony. Our examination of the record leads us to conclude that although Mrs. Green is still employable as a part-time bookkeeper, her employment prospects are limited.
We observe that Mrs. Green has certain unliquidated assets. Among them is her undivided interest in the couple's corporation, which has yet to be partitioned. Until a partition of the community occurs, we are unable to determine the extent of Mrs. Green's community assets. Additionally, she has a house upon which there is currently a $28,000 mortgage and an interest in her father's estate upon which her mother apparently has a usufruct. However, the law does not require that Mrs. Green liquidate these assets in order to support herself.
At trial both spouses submitted affidavits detailing their respective monthly expenses. Examination of these affidavits forces us to conclude that both spouses have slightly exaggerated various expenses. Based upon our review of the record, we find that Mrs. Green's monthly expenses are about $1,350, while those of Mr. Green (excluding the expenses of Kathy and her child) are about $1,200.
The records presented at trial fail to specifically establish Mr. Green's monthly income. This is apparently due to the nature of the construction business and the fact that he had just established Pro-Build, Inc., a few months before trial. (However, Pro-Build appears to be a mirror image of K.R. Green Designer/Builders, Inc.) Mr. Green's bank records fail to establish a clear pattern of salary payments from Pro-Build. Periodically, he receives from Pro-Build checks of varying amounts. It appears that he pays himself as he requires the funds.
One cannot avoid all or a part of his alimony obligations by exercising exclusive control over a corporation wholly owned by him in order to limit his own salary. Where a person has complete discretion in managing the finances of such a corporation, the profits of the corporation must be considered his profits. Moncus, supra.
In January, Mr. Green deposited checks from Pro-Build totalling $2,700 into his personal checking account. The following month he deposited $300. In March, 1989, he received checks totalling at least $2,519. Averaging these amounts, we find that between January and March of 1989, Mr. Green received approximately $1,850 per month in salary.
Article 160 provides that a former spouse may not be required to pay in excess of one-third of his income as alimony. Therefore, considering the income and expenses of both parties, we direct that Mr. Green pay unto Mrs. Green alimony of $600 per month.

CONCLUSION
The judgment of the trial court is reversed insofar as it assessed fault on the part of Mrs. Green in the initial separation.
Judgment is hereby rendered in favor of Barbara Pixley Green and against Kevin R. *148 Green, finding Mrs. Green to be free from fault and directing that Mr. Green pay unto Mrs. Green permanent alimony in the amount of $600 per month, from date of judicial demand.[3] In all other respects, the trial court judgment is affirmed.
Costs are assessed against the appellee.
REVERSED IN PART, AFFIRMED IN PART, PERMANENT ALIMONY AWARDED, AND RENDERED.
NOTES
[1] Art. 160 states in pertinent part:

A. (1) When a spouse has not been at fault and has not sufficient means for support, the court may allow that spouse, out of the property and earnings of the other spouse, permanent periodic alimony which shall not exceed one-third of his or her income....
[2] Art. 143 states:

Separation grounded on abandonment by one of the parties can be admitted only in the case when he or she has withdrawn himself or herself from the common dwelling, without a lawful cause, has constantly refused to return to live with the other, and when such refusal is made to appear in the manner hereafter directed; provided, however, that separation grounded on abandonment may be the object of a reconventional demand in any suit for separation from bed and board.
[3] See LSA-R.S. 9:310 and Hogan v. Hogan, 549 So.2d 267 (La.1989).