579 So.2d 1124 (1991)
Homer Ray DEAN, Appellee,
v.
Diane Lavon McVay DEAN, Appellant.
No. 22424-CA.
Court of Appeal of Louisiana, Second Circuit.
May 8, 1991.
*1125 Campbell, Campbell & Johnson by James M. Johnson, Minden, for appellee.
Sanford & Lilly by Roy M. Lilly, Jr., Baton Rouge, for appellant.
Before SEXTON, NORRIS and HIGHTOWER, JJ.
NORRIS, Judge.
Defendant, Diane Lavon McVay Dean, appeals a judgment of separation signed May 11, 1990, based on mutual fault, and requests reversal of the finding of fault on her part. We reverse in part and render.

FACTS
The Deans married on July 14, 1967. They had three children: Carolyn, Janet, and Tressa, ages 21, 20 and 7 respectively at time of trial. Custody of Tressa is not disputed.
The seeds of this marital dispute were sown in 1972 when, as a result of a "religious experience," Mr. Dean renounced television for himself and his entire family. As a result, he threw the family TV in the gravel pit and later forced Mrs. Dean to return a television given to her by her parents. When asked about his ban of television for the entire family, he testified, "I think a man is the head of the house. At least he should be anyway." Tr. 59. He further testified that he "absolutely refused" to allow his wife to watch television in their home and felt that his wife had no right to decide or make her own choice about the matter.
The marital problems suddenly intensified in April 1989 when Mr. Dean discovered Mrs. Dean was secretly watching a small three inch TV which she had purchased and kept hidden. He found it and demanded she do away with it; she refused, but continued to hide it from him. He cut the cord at one point and even intentionally knocked it off the cabinet. Both parties acknowledged that discord over television became the major problem in the marriage.
*1126 About the same time as the television incident, Mr. Dean testified he became suspicious of his wife's friendship with a Mr. Larry Stratton. Mr. Stratton was working for Mr. Dean's lawn mowing business in which Mrs. Dean also helped out. In addition, Mr. Stratton had dated Carolyn, the Deans' daughter. Mrs. Dean testified she and Mr. Stratton were friends.
Mr. Dean learned that Mr. Stratton would come to the Deans' house early in the morning and drink coffee with Mrs. Dean before starting their work in the lawn care business. At some unspecified time the pastor of Mr. Dean's church told him that Mr. Stratton had molested an 11-year old boy; this alleged stain on Mr. Stratton's character was never substantiated at trial. Both parties testified they had discussions about Mr. Stratton in the summer of 1989; however, Mr. Dean admitted that there were no heavy arguments and Mrs. Dean acknowledged the discussions were infrequent.
Several members of the First United Pentecostal Church of Minden, of which the Deans and Stratton were members, testified to seeing Mrs. Dean and Mr. Stratton together at public places. This testimony, however, merits close scrutiny. Ms. Pevy testified she saw the two "physically embracing" outside Mrs. Dean's car by the Minden High School track at about 9:00 one night, but admitted she spied them for only a second in the glare of her passing headlights. At first Ms. Pevy testified she had seen Mrs. Dean and Larry "sitting by the car hugging up several times." (emphasis added) She later recanted and testified she saw them only once. Tr. 61, 62. In fact, her entire description of what she saw was vague and confusing; she summarized:
"Well whenever I stopped at the stop sign all I could see is that car and them two standing together. And I didn't stop, I mean just stare at them, you know at them, I just went. I mean I wasn't going to stop and just watch them." (emphasis added) Tr. 67.
Moreover, this occurred in April 1989, but Ms. Pevy did not disclose it to Mr. Dean until about a week prior to trial. Thus, it could have had no effect on Mr. Dean's decision to leave.
Mrs. Yocum testified the two had been walking at the track, which was well lighted, as many as ten times, but did not say how many of those times they were alone. The track was a favorite nighttime walking place for area residents. Ms. Tanner testified the two were together at the playground while Mrs. Dean was watching Tressa; she testified that at one point when she passed by she saw them sitting closely in Mrs. Dean's car; on her return trip they were standing under a tree on the playground. Testimony also indicated they were friendly at church and often kept each other company in the parking lot after church while Mr. Dean drove some of the elderly church members home.
Although the testimony of the church members indicated their suspicion as to the relationship between Mr. Stratton and Mrs. Dean, none would say there was a romantic involvement between the two, and Mrs. Dean flatly denied it. In addition, all of the alleged "meetings" occurred prior to late August 1989, several months before the actual physical separation of December 1, 1989. Again, the record is unclear as to dates, but the testimony shows that when Mr. Dean demanded his wife stop seeing Mr. Stratton in public places, she did not refuse.
Mrs. Dean frequently went to Stratton's house to style his mother's hair; she would see Mr. Stratton on these occasions. She admitted to being at his house in April 1989 when his parents were not at home, but steadfastly claimed that they only watched TV which she was not allowed to do at her own home. She categorically denied any romantic involvement with Mr. Stratton, claiming they are just good friends and that most of their conversations concerned Mr. Stratton's relationship with Carolyn and television. She testified Mr. Stratton was at the track on one occasion when she was there, but her husband was also present.
Mr. Dean also complained that his wife refused sexual relations with him after their anniversary on July 14, 1989, and that *1127 about a month later she moved out of their bedroom. The record is unclear, however, as to how many times he actually approached her for sexual relations after this time. Mrs. Dean claimed he would physically force or attempt to force her to have sexual relations when she did not feel like it and she would have to wrestle to get free and escape to her daughter's bedroom for safety. She frankly admitted, however, that she had also denied him on an occasion when he approached her in a loving and kind way because he "refused to let me watch TV and I thought if II justIf I had to do without TV, maybe he could do without sex." Tr. 87.
Also in April 1989 Mrs. Dean began counseling with a Ms. Sandra Aulds, a family counselor for the YWCA. At counseling sessions, Ms. Aulds advised Mrs. Dean of her rights in the marriage and instructed her on how she could make the marriage work. She also explained the methods and effects of mental abuse to Mrs. Dean. Ms. Aulds, testifying as an expert in the field of family violence, defined mental abuse or violence as "a form of domestic violence in that it is a method of controlling the actions and thoughts of one person * * * for the purpose of controlling the marriage," and as "a form of violent behavior, though it's not physical." Tr. 97. She testified that Mr. Dean mentally abused his wife by utilizing religion as a method of controlling her. He also utilized threats and intimidation, usually relating to financial support, in an attempt to force Mrs. Dean to conform to his expectations. She told Mrs. Dean that her husband was mentally abusing her and that it was not improper to maintain her friendship with Mr. Stratton. She urged Mrs. Dean not to give in to Mr. Dean's unreasonable demands.
Ms. Aulds testified that she met with Mr. Dean for one session after she began counseling Mrs. Dean and he never suggested that Mrs. Dean was doing anything wrong other than watching television and talking to Larry Stratton. Ms. Aulds was of the opinion that Mr. Dean's mental abuse of Mrs. Dean was not a recent development but a pattern of long standing.

PROCEDURAL HISTORY
Mr. Dean filed suit for separation on December 13, 1989, alleging cruel treatment based on: (1) numerous meetings with Larry Stratton, (2) refusal to engage in sexual relations from July 14, 1989, until physical separation on December 1, 1989, and (3) her insistence on watching TV against his religious beliefs. Mrs. Dean reconvened alleging Mr. Dean abandoned her on December 1, 1989, and cruel treatment based upon his domination of the marriage and his refusal to allow any member of the family to watch television.
After a trial in April 1990, the court granted a separation based upon mutual fault. The court in oral reasons did not specify its findings of mutual fault. Judgment was signed May 11, 1990. On appeal, Mrs. Dean contests the court's finding that she was at fault. Mr. Dean did not appeal from the judgment.

LAW
At the time this action was filed, to be guilty of mutual fault, each of the parties had to furnish one of the grounds for separation in La.C.C. art. 138 (1804).[1]Brewer v. Brewer, 573 So.2d 467 (La.1991). One of these grounds was "cruel treatment":
Article 138. Grounds for Separation from Bed and Board
Separation from bed and board may be claimed reciprocally for the following causes:
* * * * * *
(3) On account of habitual intemperance of one of the married persons, or excesses, cruel treatment, or outrages of one of them towards the other, if such habitual intemperance, or such ill-treatment is of such a nature as to *1128 render their living together insupportable[.]

* * * * * *
A separation on the ground of mutual fault precludes permanent alimony. La.C.C. art. 141 (1976).[2]
A spouse seeking a separation bears the burden of proving by a preponderance of the evidence the facts in support of his demand. Edelen v. Edelen, 457 So.2d 171 (La.App.2d Cir.1984). A continuous pattern of mental harassment, nagging and griping by one spouse directed at the other can constitute cruel treatment; however, mutual incompatibility, fussing and bickering cannot. Jenkins v. Jenkins, 441 So.2d 507 (La.App.2d Cir.1983), writ denied 444 So.2d 1223 (1984). Fault in the generic sense cannot be equated with legal fault. Legal fault occurs when a spouse commits cruel treatment or excesses which compel a separation because the marriage is insupportable. Brewer, supra. All spouses have faults and a spouse need be neither perfect nor blameless to be free from legal fault. Brewer, supra; Pearce v. Pearce, 348 So.2d 75 (La.1977).
To constitute fault, the spouse's misconduct must not only be of a serious nature, but must also be an independent contributory or proximate cause of the separation rather than a reasonably justifiable or natural response to the initial fault on the part of the other spouse. Kendrick v. Kendrick, 236 La. 34, 106 So.2d 707 (La. 1958); Higginbotham v. Higginbotham, 457 So.2d 165 (La.App.2d Cir.1984); Honley v. Honley, 416 So.2d 631 (La.App.2d Cir.1982); Oliver v. Oliver, 393 So.2d 192 (La.App. 1st Cir.1980), writ denied 397 So.2d 1358 (1981); Jones v. Jones, 442 So.2d 817 (La.App. 4th Cir.1983); Adler v. Adler, 239 So.2d 494 (La.App. 4th Cir.), writ denied 257 La. 168, 241 So.2d 530 (1970). A reasonably justifiable or natural response to the other spouse's legal fault is not fault within the meaning of La.C.C. art. 160 (1870) which will support a finding of mutual fault.[3]Higginbotham, supra. A finding of fault by the trial court will not be disturbed on appeal absent clear error. Brewer, supra.

DISCUSSION
The record indicates that Mr. Stratton and Mrs. Dean saw each other occasionally, usually because of church or work. They may have also seen each other alone on a few isolated occasions; Mrs. Dean explained that these meetings involved conversations about Carolyn and television. No witness could testify to more than a suspicion of romantic involvement between the two. Mr. Dean admitted he had never seen them engage in any improper conduct. "The fact that a man and a woman are alone together does not necessarily justify presuming that it is for romantic or sexual reasons." Wynn v. Wynn, 513 So.2d 489, 491 (La.App. 2d Cir. 1987). Explanations of conversations about Carolyn and television are certainly plausible. Ms. Aulds also counseled Mrs. Dean not to give in to Mr. Dean's request that she end her association with Mr. Stratton. Even accepting all the evidence for what it tends to prove, a reasonable factfinder could not find in this record by a preponderance of proof a romantic involvement or even an improper friendship between Mrs. Dean and Mr. Stratton.
Moreover, the time frame presented makes it highly unlikely that Mrs. Dean's meetings with Mr. Stratton were even the cause of the separation. There is no evidence that they ever met alone after August, 1989, and Mr. Dean did not leave until December 1, 1989.
Mrs. Dean testified that she did not refuse Mr. Dean's request that she stop being seen in public with Stratton and there is no evidence that she failed to honor it. Further, Mrs. Dean testified that she did not ask her husband to leave and would still live with him if he would treat her as *1129 an equal partner in the marriage. Under these facts the trial court could not have found that the friendship between Mrs. Dean and Mr. Stratton was the proximate cause of the separation or that it compelled the separation by making the marriage insupportable. Rather, the record shows that the cause was Mr. Dean's abandonment, his unyielding domination of the marriage and mental cruelty towards Mrs. Dean. The record clearly indicates that Mrs. Dean's refusal to repudiate her friendship with Mr. Stratton was a justifiable response by Mrs. Dean to Mr. Dean's absolute dominion over their marital relationship. Brewer, supra; Higginbotham, supra. The trial court's implicit finding to the contrary is clearly wrong.
Mr. Dean's second ground for separation is that Mrs. Dean refused to engage in sexual relations with him after July 14, 1989. The issue of whether sexual denial constitutes legal fault depends upon the facts and circumstances of each case. Nowlin v. Nowlin, 482 So.2d 882 (La.App. 2d Cir.1986). In order to constitute cruel treatment, the persistent denial of sexual intercourse must be unreasonable and unjustified. Von Bechman v. Von Bechman, 386 So.2d 910 (La.1980); Nowlin, supra; Boudreaux v. Boudreaux, 460 So.2d 722 (La.App. 3d Cir.1984); Phillpott v. Phillpott, 285 So.2d 570 (La.App. 4th Cir.1973), writ denied 288 So.2d 643 (1974); Mattern v. Mattern, 545 So.2d 645 (La.App. 5th Cir.1989). The party that alleges the refusal of sexual intercourse has the burden to show that there was persistent and unjustified refusal. Wheelahan v. Wheelahan, 557 So.2d 1046 (La.App. 4th Cir.), writ denied 559 So.2d 1379 (1990).
Mrs. Dean testified that any time she refused Mr. Dean sex, it was in direct response to Mr. Dean's absolute refusal to allow her to watch television in her own home and to his use of physical force when she did not feel like engaging in sex.
As noted, Mrs. Dean testified that she was willing to stay in this marriage if she could be an equal partner with an equal voice. A wife should not be put in the unenviable posture of being required to submit without question to her husband's every whim. She should not be forced to have sexual relations with him when she has valid and justified reasons for refusal.
As noted earlier, Mrs. Dean was acting on the advice of her family counselor who proposed a course of conduct aimed at saving the marriage, which was not an unreasonable response to Mr. Dean's mental abuse. We readily recognize that there are some actions which Mrs. Dean might have taken which would not be considered justifiable responses (i.e., physical threats and violence); however, under the facts presented by this record, Mrs. Dean's conduct was justified as a response to her husband's attempts to force sex and to control her actions against her will. Higginbotham, supra. The trial court's findings to the contrary are plainly wrong. Brewer, supra.
Mr. Dean's third ground and obviously his major complaint with Mrs. Dean is that she continued to watch television after he absolutely forbade it. One spouse cannot force the other to adhere to a religious belief of this nature. The argument is inherently without merit.
We conclude that neither Mrs. Dean's friendship with Mr. Stratton nor her withholding of sexual relations was the proximate cause of the separation; rather, they were justified and reasonable responses to the longstanding mental violence and sexual force visited upon Mrs. Dean. Based on this record, Mrs. Dean's refusal to honor her husband's ban on television more probably than not caused Mr. Dean to leave home. However, this refusal certainly does not constitute legal fault. Even when we give full credence to the testimony of Mr. Dean and the witnesses appearing on his behalf, we find the evidence does not satisfy his burden of proving fault on the part of Mrs. Dean. Her conduct did not constitute legal fault. Brewer, supra.
Mr. Dean did not appeal the separation based, in part, on his fault. Thus, the judgment of separation signed May 11, 1990 remains intact in that respect. We reverse the portion assessing fault to Mrs. Dean and render.

*1130 IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the plaintiff-in-reconvention, Diane Lavon McVay Dean and against the defendant-in-reconvention, Homer Ray Dean, granting a separation from bed and board on the basis of the sole legal fault of Homer Ray Dean.
Costs of this appeal are assessed to appellee, Homer Ray Dean.
REVERSED IN PART AND RENDERED.
HIGHTOWER, J., concurs with written reasons.
HIGHTOWER, Judge, concurring.
While disagreeing that the withholding of sexual relations can be justified by the fact that the other spouse would not allow television viewing, or by reliance upon advice from a family counselor, I concur that the evidence in this case does not sufficiently establish the persistent nature of defendant's conduct in that respect.
NOTES
[1] La.C.C. art. 138 (1804) was also repealed in 1990. 1990 La. Acts No. 1009, § 2, effective January 1, 1991.
[2] La.C.C. art. 141 (1976) was repealed in 1990 as part of a revision to eliminate the action and judgment of separation. 1990 La. Acts. No. 1009, § 2, effective January 1, 1991.
[3] La.C.C. art. 160 (1870) was redesignated as La.C.C. art. 112 by 1990 La. Acts No. 1008, § 8, No. 1009, § 10, both effective January 1, 1991.