593 So.2d 1331 (1991)
Karl R. GITSCHLAG
v.
Carolyn Glynn, Wife of Karl R. GITSCHLAG.
No. 90 CA 0967.
Court of Appeal of Louisiana, First Circuit.
December 27, 1991.
*1333 Clayton J. Borne, III, Metairie, for plaintiff-appellant.
Douglas C. Ellis, Covington, for defendant-appellee.
Before LOTTINGER, WATKINS, SHORTESS, CARTER and LEBLANC, JJ.
LOTTINGER, Judge.
Plaintiff, Karl R. Gitschlag, appeals from a judgment awarding defendant, Carolyn Glynn Gitschlag, permanent periodic alimony at the rate of $300.00 per month. The plaintiff argues that the defendant abandoned the marital domicile and is thus at fault in the termination of the marriage so as to be precluded from receiving permanent alimony.

FACTS AND PROCEDURAL HISTORY
Plaintiff and defendant were married in January, 1980. Prior to this marriage, the parties purchased a house as co-owners and entered into a marriage contract whereby they would remain separate in property. Pursuant to the marriage contract they were to share equally in the household expenses. No children were born of the marriage.
In November of 1982, Carolyn moved out of the bedroom that she shared with Karl. Then in August of 1983, after receiving fire insurance proceeds from a rent house which was her separate property, Carolyn bought a mobile home and moved out of the marital dwelling.
On December 17, 1986, Karl filed a petition for divorce based on living separate and apart for over one year. Carolyn reconvened alleging cruelty on Karl's part, and Karl amended his petition to allege abandonment and cruel treatment by Carolyn. On August 25, 1988, pursuant to Karl's motion for summary judgment, the parties were granted a divorce based on living separate and apart for more than one year. The fault of the parties was not litigated in that proceeding.
*1334 On October 3, 1989, Carolyn filed the instant rule seeking permanent alimony from Karl. After a trial on the merits, the trial court held that Carolyn was without fault in causing the separation and was in necessitous circumstances. Carolyn was awarded permanent periodic alimony from Karl in the amount of $300.00 per month. Karl appeals from this judgment.

ASSIGNMENTS OF ERROR
The plaintiff/appellant specifies the following errors:
1. The trial court erred in finding that Mrs. Gitschlag was not at fault in causing the separation, and specifically in not finding that she had abandoned her husband.
2. The trial court erred in failing to consider Mr. Gitschlag's freedom from fault in causing the separation.
3. The trial court erred in finding that Mrs. Gitschlag was without sufficient means for her support and awarding permanent alimony in the sum of $300.00 per month.

STANDARD OF REVIEW
As with any factual finding, a trial court's findings of fact relative to the issue of fault in domestic cases are entitled to great weight and will not be overturned on appeal absent manifest error. Thibodeaux v. Thibodeaux, 525 So.2d 69, 71 (La.App. 3rd Cir.1988); Blake v. Blake, 478 So.2d 617, 619 (La.App. 2nd Cir.1985); Rodrigue v. Rodrigue, 424 So.2d 1185, 1187 (La.App. 1st Cir.1982).
Additionally, an appellate court cannot reverse a trial court's award of alimony unless the trial court has abused its discretion in making the award. Hogan v. Hogan, 549 So.2d 267, 271 (La.1989). Once the court of appeal has determined that the trial court has abused its discretion, it must make a de novo assessment of the evidence in the record and render a judgment on the merits as if it were a trial court. Id. at 271.
In the instant case, the wife, who admittedly moved out of the marital dwelling, seeks permanent alimony. The husband has alleged that the wife abandoned him and is thus not entitled to permanent alimony. The trial court, in its reasons for judgment, found that the wife was not guilty of cruel treatment, and thus not at fault in the dissolution of the marriage. The trial court then found the wife to be in necessitous circumstances and awarded permanent alimony.
The trial court did not make any explicit findings on the issue of whether the wife was guilty of abandonment. Based on this lack of an explicit finding by the trial court on this crucial issue, and on certain evidentiary rulings made by the trial court,[1] we are convinced that the trial court did not properly consider the issue of abandonment, and has thus abused its discretion in awarding permanent alimony without deciding whether the spouse seeking that alimony was guilty of abandonment. Therefore, *1335 we must decide whether, based on all of the evidence in the record, Mrs. Gitschlag is guilty of abandonment and thus precluded from receiving permanent alimony.[2]

ABANDONMENT
Permanent alimony may only be awarded to a spouse who has not been at fault in the termination of the marriage. Former La.Civ.Code art. 160;[3]Adams v. Adams, 389 So.2d 381, 382 (La.1980); Steib v. Steib, 469 So.2d 20, 21 (La.App. 1st Cir. 1985); Jergins v. Jergins, 451 So.2d 1336, 1338 (La.App. 1st Cir.1984); Rodrigue, 424 So.2d at 1187.
"Fault" for purposes of permanent alimony preclusion is synonymous with conduct which will entitle the other spouse to a separation or divorce under former La.Civ.Code arts. 138(1)-(8) or 139.[4]Adams, 389 So.2d at 383. Additionally, for misconduct to constitute fault which will preclude permanent alimony, it must be of a serious nature and an independent contributory or proximate cause of the termination of the marriage. Id. at 382; Pearce v. Pearce, 348 So.2d 75 (La.1977). The burden of proving freedom from fault is on the spouse seeking alimony. Rodrigue, 424 So.2d at 1187.
Former La.Civ.Code art. 138(5)[5] provided that a spouse has grounds for separation from bed and board if the other spouse abandons him or her. Since Carolyn left the matrimonial domicile and Karl has alleged abandonment, and Carolyn now seeks permanent alimony, the burden of proof is on Carolyn to show that she did not abandon Karl.
Former La.Civ.Code art. 143[6] sets forth the three elements which together constitute abandonment: one spouse's withdrawal from the common dwelling, without lawful cause, and a constant refusal to return. Blake, 478 So.2d at 619; Dugas v. Dugas, 424 So.2d 1189, 1190 (La. App. 1st Cir.1982). It is undisputed that Carolyn moved out of the common dwelling, thus the first element is met.
The third element, a constant refusal to return, is also met in this case. Although Carolyn testified that she offered to return but Karl refused her,[7] the testimony of both Carolyn and Karl was that Karl asked if he could move into the mobile home with Carolyn, but that she refused. *1336 We have previously held that even where a separation is initially voluntary,[8] where one spouse then requests recohabitation and the other refuses, the refusing spouse will be guilty of abandonment absent a lawful cause. Hart v. Hart, 525 So.2d 229, 230 (La.App. 1st Cir.1988); Yamayans v. Yamayans, 490 So.2d 371, 373 (La.App. 1st Cir.1986). Therefore, Carolyn's refusal to allow Karl to move into the mobile home with her constituted the third element of abandonment set forth in former La.Civ. Code art. 143.
The only issue left to be resolved with respect to whether Carolyn is guilty of abandonment is whether she had lawful cause to leave the marital domicile. In this circuit, lawful cause sufficient to justify a spouse's departure from the marital domicile is equivalent to reasons for leaving which constitute grounds for separation under former La.Civ.Code art. 138.[9]Leggio v. Leggio, 491 So.2d 440, 442 (La.App. 1st Cir.1986); Dugas, 424 So.2d at 1190. Whether a cause for separation is "lawful" under former La.Civ.Code art. 143 is a question of law. Durand v. Willis, 470 So.2d 947, 951-52 (La.App. 3rd Cir.1985).
Thus, where one spouse unilaterally decides to leave the marital domicile, and subsequently refuses to return, the separation is either for lawful cause which entitles the leaving spouse to a separation based on former La.Civ.Code arts. 138 or 139, or it is abandonment. Id. at 953-54. Carolyn must either have proven conduct on the part of Karl which would entitle her to a separation under Articles 138 or 139, or she is guilty of abandonment.
Carolyn has alleged that certain conduct on the part of Karl drove her from the marital domicile. If this conduct constituted grounds for a separation under Articles 138 or 139, then Carolyn had lawful cause to leave the marital domicile. The type of conduct alleged by Carolyn is such that the only possible ground for separation available to her is Article 138(3) cruel treatment.
A finding of cruel treatment under former La.Civ.Code 138(3) requires two separate factual analyses. First, it must be determined whether or not the conduct which is alleged to be cruel treatment actually occurred. Second, it must be determined whether or not that conduct, if it occurred, rendered the parties living together insupportable. Yamayans, 490 So.2d at 373; Durand, 470 So.2d at 950.
Carolyn testified that the reason she moved to a separate bedroom and ultimately out of the marital dwelling was because she was very sick and very depressed and on a lot of medication, and because she felt like all of the responsibility for paying the bills was on her and she could not take the pressure any longer. She alleged a general lack of communication between the parties and a refusal to have sex by Karl. She said she moved out because Karl was not trying hard enough to find a job and was not making enough money and not contributing to the household expenses.
She testified that shortly before she moved out she had asked Karl to leave and that he agreed, but then changed his mind. She claimed that after she moved out she offered to come back but that Karl would not allow it unless she converted to his religion and agreed to obey him. She testified that Karl changed the locks on the marital home after she left. Carolyn admitted that Karl asked if he could move in with her in the mobile home but that she refused. She said that Karl's motive for wanting to do this was financial.
*1337 Karl alleged that he was trying to find a job and alleged that Carolyn constantly disparaged and belittled him after he lost his job. He denied that he refused to have sex with Carolyn. He testified that he asked her to come back to him but she refused, and that he even offered to move in with her in an attempt to save his marriage.
He testified that he tried marriage counseling in an attempt to get back together with Carolyn and although he went to several sessions both before and after Carolyn moved out he could only get her to go to one session. He admitted changing the locks, but said he only did so after he realized that there was no chance of getting back together.
Some of the reasons given by Carolyn for leaving the matrimonial domicile, i.e. that she was sick and depressed, couldn't handle the responsibility of paying the bills when Karl was offshore, and a general failure to communicate, seem to indicate an overall dissatisfaction with the marriage on her part and a lack of compatibility between the parties. General dissatisfaction and mutual incompatibility, as described in Carolyn's testimony, is not grounds for separation and thus not lawful cause for abandonment, no matter how intense it is. Leggio, 491 So.2d at 442; Oster v. Oster, 480 So.2d 470, 472 (La.App. 5th Cir.1985); Blake, 478 So.2d at 619; Dugas, 424 So.2d at 1191.
Two of the reasons given by Carolyn for leaving the matrimonial domicile could constitute cruelty if the two prong analysis set forth above is satisfied. These are Carolyn's allegations of intentional non-support by Karl, and the claim that he refused to have sex with her during the marriage.
Carolyn testified that Karl did not make enough money to pay for his share of the household expenses because he was out of work for most of the time they were married and did not try hard enough to get another job. Carolyn claimed that she paid a disproportionate share of the household expenses with her separate property.
The evidence adduced at trial indicates that in October of 1982, Karl's employer, an oilfield service company, went out of business and Karl lost his job. Despite his efforts to secure employment in his field, Karl was unable to do so and began drawing unemployment compensation.[10] Shortly after Karl lost his job Carolyn became very ill, and was unable to continue working at her place of employment.[11]
Between October of 1982, and April of 1983, Karl actively sought employment in the oil field and also worked at various temporary jobs including painting houses, working as a substitute teacher in local schools, and as a gas station attendant. In April of 1983, he began training as an insurance and securities salesman, and in June of 1983 became a fully licensed insurance and securities salesman for Western Reserve.
All of the income earned by Karl from the time of the marriage until the physical separation of the parties in August of 1983, including the unemployment compensation benefits, was placed into the joint checking account from which the household expenses were paid. This income was apparently insufficient to meet the household expenses, however, and Carolyn had to pay more than her half from her separate *1338 funds. Carolyn was later reimbursed for the excess amount that she contributed.[12]
Karl was out of a permanent job for a total period of nine months, and three of those months were spent training for a new job. He actively sought employment and held various part time jobs during the other six months, and drew unemployment compensation during the entire period that he was without a permanent job. All of the income that he did earn during the marriage was deposited into the joint checking account of the parties.
Assuming that intentional non-support of one spouse by the other can constitute cruelty, the evidence clearly demonstrates that the financial difficulties encountered by these parties was not due to any intentional acts on the part of Karl.[13] Therefore, Carolyn has failed to prove intentional non-support on the part of Karl, and has not established lawful cause to leave the matrimonial domicile based on that ground.
Carolyn also testified that Karl "sexually didn't want to have anything to do with" her prior to the time that she moved out. She further testified that Karl did not respond to her sexual advances. However, she admitted that he would try to have sex with her when he came back from offshore, and that on at least one occasion after she moved out of the marital bedroom, they did have sex at her request.
In order for a denial of sexual relations to be considered cruel treatment within the meaning of former La.Civ.Code art. 138(3), there must be an unjustified and persistent refusal to engage in sexual relations. Von Bechman v. Von Bechman, 386 So.2d 910, 912 (La.1980); Jergins, 451 So.2d at 1338. Additionally, the denial must be such that it renders living together insupportable for the other spouse; that is the other spouse must not acquiesce in the denial or consent to the absence of marital relations. Denbo v. Denbo, 345 So.2d 1257, 1259 (La.App. 1st Cir.1977).
Considering the testimony in the court below as a whole, and in light of the fact that it was Carolyn who moved out of the marital bedroom, and on at least one occasion after that the parties had marital relations, we do not believe that Mr. Gitschlag was guilty of withholding sex so as to constitute cruel treatment. Rather, we believe that the parties' sexual relationship deteriorated along with the rest of their relationship, but that no lawful cause existed which would have given either of the parties grounds for a fault based separation prior to Mrs. Gitschlag leaving the marital dwelling.
Since Mrs. Gitschlag has not borne her burden of proving that she had lawful cause for leaving the marital dwelling, she is guilty of abandonment, and the trial court abused its discretion (or was clearly wrong) in awarding her permanent alimony. In light of our ruling on this issue, we pretermit consideration of the remaining assignments of error.
Therefore, for the above and foregoing reasons, it is ORDERED, ADJUDGED and DECREED that the judgment of the trial court awarding permanent periodic alimony to Mrs. Carolyn Glynn Gitschlag is hereby *1339 reversed.[14] Costs of this appeal to be borne by defendant/appellee, Mrs. Carolyn Glynn Gitschlag.
REVERSED and RENDERED.
SHORTESS, J., dissents and assigns written reasons.
SHORTESS, Judge, dissenting.
I disagree with the majority's finding that the trial court was clearly wrong in awarding Mrs. Gitschlag permanent alimony. It is clear from the questions asked Mrs. Gitschlag during the trial that the trial court considered the issue of abandonment. The court having implicitly found in Mrs. Gitschlag's favor on that issue after assessing the credibility of both parties, we may not substitute our judgment for that of the trial court.
The majority correctly states three elements are required to constitute abandonment: (1) one spouse's withdrawal from the marital dwelling; (2) without lawful cause; and (3) a constant refusal to return. Only the first element of abandonment was proven at trial. There was testimony at trial of mental cruelty by Mr. Gitschlag toward Mrs. Gitschlag from which the trial judge could have adduced she had lawful cause to leave. There was also evidence she did not refuse to return to the matrimonial domicile but was prevented from doing so by her husband, who changed the locks and stated he would allow her to return only if she become a "born-again Christian" (she is Catholic) and swore before a judge she would obey him. One spouse cannot impose his religious beliefs on the other. Dean v. Dean, 579 So.2d 1124, 1129 (La. App. 2d Cir.), writ denied, 584 So.2d 683 (La.1991). Furthermore, a spouse is not required to seek reconciliation in the face of such adverse conditions which manifest no desire for reconciliation. Schirrmann v. Schirrmann, 436 So.2d 1340 (La.App. 5th Cir.), writs denied, 440 So.2d 761, 764 (La.1983).
I would affirm the trial court's finding that Mrs. Gitschlag committed no legal fault and is entitled to permanent alimony.
I respectfully dissent.
NOTES
[1] On several occasions during the trial of this matter the trial court admonished Mr. Gitschlag's attorney that only the fault of Mrs. Gitschlag was relevant and that Mr. Gitschlag's freedom from fault was irrelevant. On each of these occasions Mr. Gitschlag's attorney was prevented from eliciting testimony which may have tended to show that Mr. Gitschlag was free from fault.

While the trial court's statement that only Mrs. Gitschlag's fault was relevant may be technically correct in the sense that a spouse is only entitled to alimony if he/she is free from fault and the fault of the other spouse is not an issue, since Mr. Gitschlag was asserting that Mrs. Gitschlag was guilty of abandonment, and one of the elements of abandonment is leaving the marital domicile unilaterally without lawful cause; whether or not Mr. Gitschlag's actions provided Mrs. Gitschlag with lawful cause to leave was also relevant.
Lawful cause which justifies withdrawal from the marital domicile is equivalent to cause giving the withdrawing spouse grounds for legal separation. Therefore, Mr. Gitschlag's freedom from fault was relevant in this proceeding and the trial court erred in not permitting testimony on that issue. This error on the part of the trial court indicates to us that the issue of abandonment was not considered by the trial court.
[2] Even if we were to use the well settled manifest error standard in this case, see Rosell v. Esco, 549 So.2d 840 (La.1989) and Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), the result would be the same, for after a thorough review of the evidence we are convinced that Mrs. Gitschlag has not sustained her burden of proving that she was free from fault; specifically, we find that she failed to prove that she had lawful cause to leave the marital dwelling and is thus guilty of abandonment. The trial court was manifestly wrong to hold otherwise.
[3] Former La.Civ.Code art. 160 was redesignated as La.Civ.Code art. 112 pursuant to Act 1990, No. 1008, § 8, eff. Jan. 1, 1991, and Act 1990, No. 1009, § 10, eff. Jan. 1, 1991.
[4] These articles were amended and reenacted as articles 102 through 105 by Act 1990, No. 1009, § 2, effective Jan. 1, 1991. The provisions of former article 138, which listed the grounds for separation from bed and board, are not included in the new articles. The doctrine of separation from bed and board has been eliminated under the new codal domestic scheme. Former Article 139, which listed the grounds for immediate divorce, has been incorporated into the new codal scheme as two of the three grounds for divorce in new Article 103.

However, pursuant to La.R.S. 9:381 and 9:382, the law in effect prior to Jan. 1, 1991, applies to the instant case since the judgment being appealed was rendered prior to that date. Therefore, the plaintiff is only entitled to permanent alimony if she can prove her freedom from fault as defined in former Articles 138(1)-(8) and 139.
[5] See footnote 4.
[6] As in the case of former Article 138, the provisions of former Article 143 were not included in the new codal domestic scheme since it dealt with one of the grounds for separation from bed and board; a doctrine which has been eliminated under the new law.
[7] Karl denied this.
[8] Where a separation is voluntary, that is where both parties to the marriage desire the separation, abandonment cannot be said to have occurred because, by definition, a voluntary separation, although grounds for a legal separation under former Article 138, is not a fault based ground. However, the evidence in the instant case indicates that the Gitschlag's separation was never voluntary, but rather unilateral on Carolyn's part.
[9] For a good discussion of the split between the circuits on this issue, see Durand v. Willis, 470 So.2d 947, 952-53 (La.App. 3rd Cir.1985).
[10] Karl continued to draw unemployment compensation benefits until June 1983, when he began working as an insurance and securities salesman for a company referred to in the record as Western Reserve.
[11] When Carolyn became ill, the cause of her illness, which is quite severe, was unknown. In January of 1985, after the parties physically separated, Carolyn became convinced that her illness was caused by toxic fumes produced during renovation of the building where she worked in back in 1980. She filed a lawsuit, which was still pending at the time of the trial below, against several parties involved in the renovation. In addition to various physical afflictions, her lawsuit alleges that these fumes have caused her severe emotional and psychological problems.
[12] After the physical separation of the parties, a lawsuit alleging defects in the house that they co-owned and inhabited together during the marriage was resolved in favor of the parties and against the builder, via a consent judgment. In order to recompense Carolyn's payment of a disproportionate share of the household expenses, she received a larger share of this judgment than Karl.
[13] Although Carolyn testified that Karl did not try hard enough to obtain other employment after he lost his oilfield job, she offered no evidence to rebut Karl's testimony that during the six month period when he was seeking employment, he sent employment applications to every U.S. diving company that he could find, plus a few foreign ones, had approximately six interviews with different diving companies, and worked at several temporary jobs before beginning his training as a securities and insurance salesman.
[14] In accordance with Hogan, 549 So.2d at 274, this reversal of permanent alimony is retroactive to the filing date of the rule for alimony.