743 So.2d 1257 (1999)
Harry Thomas MAYES
v.
Jeri Hoover MAYES.
No. 98 CA 2228.
Court of Appeal of Louisiana, First Circuit.
November 5, 1999.
*1258 Alexis A. St. Amant II, St. Amant & St. Amant, Baton Rouge, LA, for plaintiff-appellant Harry Thomas Mayes.
Amy E. Counce, Baton Rouge, LA, for defendant-appellee Jeri Hoover Mayes.
*1259 BEFORE: SHORTESS, PARRO, and KUHN, JJ.
PARRO, J.
The initial issue in this appeal is whether Jeri Hoover Mayes (Jeri) was free from fault in the dissolution of her marriage to Harry Thomas Mayes (Tom), such that she is entitled to permanent alimony from him. If so, was the trial court's award of $450 per month appropriate. Having reviewed the evidence and applicable law, we affirm.

BACKGROUND
Jeri and Tom were married on June 10, 1994, and had two children. They separated when Jeri left with the children in July 1997, and were divorced on February 3, 1998. The divorce was granted on the basis of Louisiana Civil Code article 102, and therefore the fault of either party was not an issue. The trial court entered judgments concerning child custody and support in accord with the stipulations of the parties, and a trial was held on May 4, 1998, on Jeri's request for permanent alimony.[1] After considering the testimony of both parties and their witnesses, along with documentary evidence of the parties' incomes and Jeri's expenses, the court stated:
The court does believe that she was without fault in the breakup of the marriage. The court will set the amount of alimony at $450.00 per month payable in two equal semi-monthly installments on the first and fifteenth.
The judgment, which was signed May 13, 1998, made the award retroactive to the date of the signing of the judgment of divorce.
Tom contends the trial court erred in finding Jeri free from fault, because she caused the divorce by abandoning him and the marital domicile without lawful cause. In the event this court agrees with the trial court's finding that Jeri is entitled to permanent alimony, Tom claims the amount granted was excessive, because the evidence did not show sufficient permissible expenses to justify this award.

FREEDOM FROM FAULT

Applicable Law
The former provisions of Louisiana Civil Code article 112, which are applicable to an award of permanent alimony in this case, stated, in pertinent part:
A. (1) When a spouse has not been at fault and has not sufficient means for support, the court may allow that spouse, out of the property and earnings of the other spouse, permanent periodic alimony which shall not exceed one-third of his or her income.
A spouse seeking permanent alimony must be without fault, and the burden of proof is upon the claimant. Gitschlag v. Gitschlag, 593 So.2d 1331, 1335 (La.App. 1st Cir. 1991). The question of fault is a factual one. A trial court's findings of fact on the issue of a spouse's fault will not be disturbed on appeal unless found to be manifestly erroneous. Pearce v. Pearce, 348 So.2d 75, 77-78 (La.1977).
Since the statutory law no longer specifies which type of fault would constitute grounds to deny permanent alimony, legal fault must be determined according to the prior jurisprudential criteria. Allen v. Allen, 94-1090 (La.12/12/94), 648 So.2d 359, 362. To constitute legal fault, misconduct must not only be of a serious nature, but must also be an independent contributory or proximate cause of the separation. Michelli v. Michelli, 93-2128 (La.App. 1st Cir.5/5/95), 655 So.2d 1342, 1350. Such acts are synonymous with the fault grounds that previously entitled a spouse to a separation or divorce. Bourg v. Bourg, 96-2422 (La.App. 1st Cir.11/7/97), *1260 701 So.2d 1378, 1380. They include adultery, conviction of a felony, habitual intemperance or excesses, cruel treatment or outrages, public defamation, abandonment, an attempt on the other's life, status as a fugitive, and intentional non-support. Former LSA-C.C. arts. 138 and 139 (repealed 1990); Bourg, 701 So.2d at 1380.
Abandonment by a spouse occurs when that spouse withdraws from the common dwelling without lawful cause and constantly refuses to return. Former LSA-C.C. art. 143 (repealed 1990); Gitschlag, 593 So.2d at 1335. Mutual incompatibility and general unhappiness with the marital relationship are not lawful causes for leaving the family home. Asher v. Asher, 521 So.2d 645, 647 (La.App. 1st Cir.1988). Lawful cause sufficient to justify a spouse's departure from the marital domicile is equivalent to reasons for leaving which constituted grounds for separation under former Article 138. Leggio v. Leggio, 491 So.2d 440, 442 (La.App. 1st Cir.1986). Thus, where one spouse unilaterally decides to leave the marital domicile, and subsequently refuses to return, the separation is either for lawful cause or it is abandonment. Gitschlag, 593 So.2d at 1336. One of the elements necessary to prove abandonment is that the abandoned spouse desired the other spouse's return. Robichaux v. Robichaux, 525 So.2d 321, 323 (La.App. 1st Cir.1988).

Analysis
This court must examine the record to determine whether the trial court's finding that Jeri was free from fault has support in the record and is not clearly wrong. Tom's only claim of fault is that Jeri abandoned him by leaving the matrimonial domicile without lawful cause. The trial court did not make a specific finding that Jeri did not abandon Tom; however, the finding that she was free from fault in the dissolution of the marriage implies such a finding. Our review of the record will focus on facts relevant to this issue.
It is undisputed that Jeri moved out of the marital domicile in July 1997 and did not return to live with her husband after that date. Her leaving with the children was the precipitating factor in their separation and led eventually to the divorce. Therefore, the first element of abandonment is met.
The next question is whether Jeri had lawful cause to leave Tom; in other words, whether his conduct toward her during the marriage rose to the level of marital fault, such that she was justified in leaving. Viewing the evidence as a whole, it is obvious the relationship was troubled before the marriage, and the additional responsibilities brought on by the birth of two children within three years did not help the situation. The parties' descriptions of their marital incompatibilities are supported by the testimony of family and friends. It is apparent that Jeri and Tom had difficulties with communication, work-sharing, and basic respect for each other. They were unable to resolve these problems in a consistently mature way. However, the stresses between them do not rise to the level of fault associated with "lawful cause" for dissolution of the marriage, as that term has been developed in the jurisprudence. Neither Jeri nor Tom had "lawful cause" to leave the marriage. Therefore, because the evidence shows Jeri left without "lawful cause," we conclude the second element of abandonment has also been met.
The third element that must exist for abandonment is that the leaving spouse constantly refused to return. Jeri announced her intention to leave after thinking about it for some time, talking to her friends about leaving, confronting Tom with her complaints, and finally deciding that she and Tom were not going to be able to resolve their problems. According to her testimony and Tom's, after she left neither of them made any real effort to put the marriage back together. Jeri was the person who wanted to be through with the marriage, so she did not make any overtures *1261 toward reconciliation. Tom said that, although he initially did not want Jeri to leave and would have welcomed her back, he did not contact her to discuss it and did not ask her to return because he thought it might be "best just to let us get some distance and let cooler heads prevail." He indicated that after several days had passed and Jeri was still determined to get a divorce, he did not ask her to change her mind because in his experience, once she had made up her mind to do something, she could not be dissuaded. However, the parties admit there was one conversation in November when Jeri mentioned that perhaps they should consider getting back together. Tom said:
[S]he kind of half-heartedly asked me if I ... would consider reconciliation and I told her at this time no I didn't want to consider it because it had been a lot of very emotional strain on me and... very, very, very emotional on the children. My son was very distraught when I first got to see him again and I couldn't go through that again.
The testimony concerning this conversation is the only evidence bearing on whether Jeri "refused to return" to her marriage. However, the responses of both parties on direct and cross examination suggest neither Jeri nor Tom was particularly interested in putting this relationship back together, and Tom ultimately rejected her one "half-hearted" gesture toward reconciliation.
With this evidence before us, we conclude the trial court had support for its implicit finding that Jeri did not abandon Tom, because the third element of abandonment was not met in this case. Further, based on the entire record, we cannot say this factual finding was clearly wrong. Although Jeri was clearly without lawful cause in taking their children and leaving Tom, under the statutes and jurisprudence by which this court must be guided, her action does not rise to the level of fault which would preclude her from obtaining permanent alimony. In this imperfect world, all spouses have faults, and a spouse need not be perfect to be free from legal fault. Almon v. Almon, 97-2004 (La.App. 1st Cir.9/25/98), 718 So.2d 1073, 1078. Therefore this court must affirm the trial court's finding that Jeri was free from fault.

ALIMONY QUANTUM

Applicable Law
The former provisions of Louisiana Civil Code article 112(A), which are applicable to a determination of the amount of alimony in this proceeding, stated, in pertinent part:
(2) In determining the entitlement and amount of alimony after divorce, the court shall consider:
(a) The income, means, and assets of the spouses;
(b) The liquidity of such assets;
(c) The financial obligations of the spouses, including their earning capacity;
(d) The effect of custody of children of the marriage upon the spouse's earning capacity;
(e) The time necessary for the recipient to acquire appropriate education, training, or employment;
(f) The health and age of the parties and their obligations to support or care for dependent children; and
(g) Any other circumstances that the court deems relevant.
The claimant spouse has the burden of proving necessitous circumstances or insufficient means for support. Faltynowicz v. Faltynowicz, 30,605 (La.App. 2nd Cir.6/24/98), 715 So.2d 90, 94. A trial court has great discretion in fixing alimony awards and its rulings will not be disturbed absent a clear abuse of that discretion. Settle v. Settle, 25,643 (La.App. 2nd Cir.3/30/94), 635 So.2d 456, 460, writ denied, 94-1340 (La.9/16/94), 642 So.2d 194.
"Support" means a sum sufficient for the claimant spouse's maintenance, *1262 which includes the allowable expenses for food, shelter, clothing, transportation expenses, medical and drug expenses, utilities, household maintenance, and the income tax liability generated by alimony payments. Settle, 635 So.2d at 460. The law does not state that a spouse with children living with her is entitled to only a portion of the expenses in the household because of the presence of the children. The entire mortgage payment, utilities, and other related expenses occur regardless of whether the children are in the home or not. Almon, 718 So.2d at 1078. Expenditures for newspapers, gifts, recreation, vacation, and church tithes are not to be considered in awarding permanent alimony. See Guillory v. Guillory, 626 So.2d 826, 832 (La.App. 2nd Cir.1993). Similarly, expenses attributable to entertainment, including cable television service, are not necessary for a spouse's maintenance and should not be considered in fixing permanent alimony. McLaughlin v. McLaughlin, 29,313 (La.App. 2nd Cir.4/2/97), 691 So.2d 834, 838.

Analysis
Tom claims the evidence did not support $450 per month of permissible expenses; therefore the trial court erred in awarding this amount. Tom argues that Jeri's monthly expenditures for cable television, a mobile phone, life insurance and long-term disability insurance premiums, lawn maintenance, debt service, legal expenses, payments on a new vehicle, and personal and grooming expenses, are not permissible in calculating permanent alimony.
The evidence shows Tom earns $64,924.78 per year; Jeri's annual gross income is $13,579.12. After deductions for taxes and insurance, her monthly net income is $830.53.[2] Jeri submitted an income-expense affidavit showing her monthly expenses exceeded her net income by $430.39. We agree with Tom that cable television expenses of $18.59 per month are not permissible for the calculation of permanent alimony. See McLaughlin, 691 So.2d at 838. However, we note that Jeri allocated only a portion of her monthly rent or mortgage note and utilities to herself, presumably to make allowances for the time during which the children live with her.[3] Jeri's expenses would be the same for these items whether or not the children lived with her. See Almon, 718 So.2d at 1078. Therefore her monthly expenses should be increased by $97.15 for rent or mortgage and $66.99 for utilities, excluding cable television. Accounting for these adjustments, Jeri's monthly deficit would actually be increased to $575.94.
We do not find that the trial court was unreasonable in considering the other expenses listed, including the mobile telephone expense of $23.28 per month[4] and lawn maintenance expense of $33.25 per month.[5] While in the past such expenses might have been considered mere conveniences, we cannot currently say these are luxuries for a working single mother with two pre-school children. But even if these amounts were deducted from Jeri's monthly expenses, her expenses would still exceed her net income by $519.41.
*1263 We also note that in making an award of permanent alimony, the trial court is mandated to consider a range of other factors detailed in former Article 112 of the Louisiana Civil Code, including the parties' relative financial status, education, and earning capacity. Tom attended three years of college and owns the home in which he resides. He has worked for BASF as a lab technician for twenty years, an excellent position reflected in his salary and benefits. In contrast, Jeri has just a high school background and short courses in college, and has worked as a secretary at Columbia Medical Center for ten years. After that length of time, her gross annual salary is still less than $14,000. She is living in a mobile home situated on property owned by her parents. Tom's counsel urged this court at oral argument to look at the case law and "do the math." However, "doing the math" in the context of a permanent alimony award is not the end of the story, and for that reason, we have not addressed each and every expense questioned by Tom, nor have we addressed several additional expenses noted by Jeri in her testimony. While the purely mathematical approach is seductive in its apparent simplicity, it does not take into account the other factors mandated by the applicable codal article and the trial court's "great discretion" in awarding permanent alimony. As long as the amount awarded is within the reasonable parameters of that discretion, this court may not disturb it. We conclude the trial court did not abuse its discretion in awarding Jeri $450 per month in permanent alimony.

CONCLUSION
For these reasons, the judgment of the trial court awarding Jeri $450 per month in permanent alimony is affirmed. All costs of this appeal are assessed against Tom.
AFFIRMED.
NOTES
[1] Because the petition for divorce in this case was filed before January 1, 1998, which was the effective date of revisions to the Louisiana statutes pertaining to alimony, the applicable law in this case consists of the pre-1998 statutes and jurisprudence. See 1997 La.Acts, No. 1078, § 4; LSA-R.S. 9:386.
[2] We do not accept Tom's contention that the deductions from her paycheck for a life insurance premium of $4.18 per month and a long term disability insurance premium of $2.86 per month are impermissible expenses.
[3] Although the record does not contain a copy of the stipulated child custody judgment, the parties testified that each parent has physical custody of the children 50% of the time.
[4] Within the not-too-distant past, television and laundry facilities in the home would also have been considered luxuries.
[5] Jeri's job requires her to work every other weekend, leaving little time for lawn maintenance, even if we were to assume that she owns a lawn mower and other yard maintenance equipment.